[Cite as *State v. Picard*, **2011-Ohio-6781.**]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| STATE OF OHIO | : | William B. Hoffman, P.J. |
|  | : | John W. Wise, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
|  | : |  |
| -vs- | : | Case No. 2009CA0108 |
|  | : |  |
|  | : |  |
| JOHN S. PICARD | : | O P I N I O N |
|  |  |  |
| Defendant-Appellant |  |  |

CHARACTER OF PROCEEDING: Criminal Appeal from Richland
County Court of Common Pleas Case
Nos. 2008-CR-545H & 2009-CR-
111H

JUDGMENT: Affirmed In Part, and Reversed and
Remanded In Part

DATE OF JUDGMENT ENTRY: December 23, 2011

APPEARANCES:

For Plaintiff-Appellee                                    For Defendant-Appellant

JAMES J. MAYER, JR.                              TERRENCE K. SCOTT
Richland County Prosecutor                      Ohio Public Defender
                                                              Assistant State Public Defender
BY: JILL M. COCHRAN                            250 East Broad Street, Suite 1400
Assistant Richland County Prosecutor       Columbus, Ohio  43215
38 South Park Street – 2nd Street
Mansfield, Ohio  44902

*Edwards, J.*

{¶1} Appellant, John S. Picard, appeals a judgment of the Richland County Common Pleas Court convicting him of twelve counts of sexual battery in violation of R.C. 2907.03(A)(1) and four counts of sexual battery in violation of R.C. 2907.03(A)(9) in case number 2008-CR-545H, and fourteen counts of sexual battery in violation of R.C. 2907.03(A)(1) and twelve counts of sexual battery in violation of R.C. 2907.03(A)(2) in case number 2009-CR-111H. Appellee is the State of Ohio.

### STATEMENT OF FACTS AND CASE

{¶2} In 1990, appellant was hired as the youth pastor at the Marion Avenue Grace Brethren Church in Mansfield, Ohio. In his position at the church, appellant and his wife Sherry had regular contact with teenage girls and young adult females in the church.

{¶3} Appellant formed close relationships with several of the girls in the youth group, distancing these girls from their family and friends. He referred to this smaller group as "the family," which was made up of appellant and his wife, several of the girls in the youth group, and eventually the girls' husbands as the girls grew older and married. As the leader, appellant controlled nearly every aspect of their lives. Appellant influenced where the girls lived, who they dated or married, and what cars they purchased. Appellant spoke of having a large piece of land where the "family" could live in a large house with separate wings, sharing a common kitchen and dining area.

{¶4} H.G. began attending the Marion Avenue Church when she was twelve years old and moved in with her great aunt and uncle after her parents died. She began babysitting appellant's children when she was sixteen. When she was sixteen, she and

appellant began kissing and fondling. One night, after eating dinner with appellant's family, H.G. went to the basement with appellant to spot him while he was working out. Appellant had H.G. perform oral sex on him. Appellant explained to H.G. that it wasn't sinful because it wasn't sex. On another occasion, appellant and H.G. were in the bedroom of appellant's home naked. Appellant digitally penetrated H.G.'s vagina, but appellant's son walked in before the encounter could go any further. H.G. left the area when she turned eighteen, but saw appellant one last time thereafter. Appellant drove her out into the country where they kissed and fondled each other, and H.G. performed oral sex on appellant.

{¶5} S.S. began attending Marion Avenue Church in her sophomore year of high school. Her mother had divorced for a second time and she had to move in with her father. While involved with the youth group, S.S. would run errands with appellant. On one occasion they went for a motorcycle ride. Appellant reached between S.S.'s legs, claiming he was switching to an alternate gas tank. Like H.G., S.S. babysat appellant's children. On one occasion, appellant asked S.S. to stop at his house after a New Year's Eve party. When she arrived, the house was dark. Appellant took her into the bedroom, kissed her, pulled down her pants and touched her genital area. He asked her to say, "Fuck me." Tr. 215. She became afraid because she had never seen appellant behave in such a harsh manner. She ultimately said what he asked her to say, although no penetration occurred. On Sundays after church appellant began taking S.S. by the hand and leading her to his office, where they would kiss and stroke each other. Appellant told her that being a youth pastor was difficult and he was frequently under attack, and this was a form of comfort his wife could not give him.

{¶6} During the summer of 2004, S.S. accompanied the youth group on a mission trip. While taking the garbage to the dumpster with appellant, he unzipped his pants and guided her head to his penis, asking her to put his penis in her mouth. He instructed her to perform oral sex on him in the back of a truck at a later time on the same mission trip. He told S.S. that this was something his wife could not do for him.

{¶7} S.W. was an only child from what she considered a normal family. However, as she became more involved with appellant and Sherry through the youth group, her relationship with her parents deteriorated. In the fall of 1995, appellant asked S.W. to kiss him. By 1996, S.W. considered appellant to be her best friend. Appellant told her that best friends engage in sexual acts with each other, claiming that the Bible states that Jonathan and David were best friends who engaged in sexual behavior together. He also told S.W. that when the Bible says a pastor should be a one woman man that just means he can't be with two women at the same time. He explained to her that his job was very taxing, and he needed her to fill him back up. Around 1996 or 1997, he asked S.W. to perform oral sex on him in the kitchen of his home. For the next ten years, she regularly engaged in oral sex and sexual intercourse with appellant. He told her it would be a worse sin for her not to have sex with him than it would be to have sex with him, because God was protecting their relationship. Sometimes when S.W. did not want to have sex with appellant she cried, and appellant told her he liked it when she cried.

{¶8} G.R. attended the youth group at the Marion Avenue Church. She had been sexually abused by her father. G.R. also babysat for appellant and Sherry. When G.R. was 13 and appellant was driving her home after babysitting, he pulled into a

wooded area and asked her to perform oral sex on him. Appellant told her that he believed God put her in his life for this special relationship because there were things Sherry could not do for him. Appellant and G.R. began engaging in oral sex and sexual intercourse on a weekly basis when she babysat for his children. Sometimes in his office in the church he would place her on his lap, rub her breasts and her genital area, and have her rub his genitals. During a game of hide and seek at a youth group overnighter at the church, appellant found G.R. hiding in the baptismal. He had G.R. perform oral sex on him in the baptismal. He told G.R. that he had consulted the Holy Spirit and had received peace that his relationship with G.R. was right. He told her that giving him oral sex was her God-given role as his comforter.

{¶9} J.F. is G.R.'s step-sister. Between the ages of 18 and 20, she began giving appellant oral sex in his office and in a storage room at the church. In April of 1999, when J.F. was 20 years old, she began engaging in sexual intercourse with appellant. After she moved into her own apartment in October, 2001, she and appellant engaged in sex once or twice a week. Appellant told her if she didn't have sex with him, he would terminate their friendship and she would be shunned by the church. Appellant hit J.F. at times, and threatened to tie her up if she did not comply with his request for sex. Appellant told her that she was a special friend who had been chosen for him. He explained to her that their relationship was not different from those in the Bible, including Jonathan and David. He told her that in the Biblical account of the Last Supper where John leans on Jesus, it is possible that John had contact with Jesus' genitals. He also recounted the story, where Abraham places his hand on another

man's thigh to make an oath, to support his claims that his relationship with J.F. was Biblically sanctioned.

{¶10} L.R. was 14 years old when she began attending the church with a friend. She admired and trusted appellant and thought of him more highly as a spiritual leader than anyone she had ever met. She longed to be a part of the group that was close to appellant and his wife. On one occasion when she was on the church bus alone with appellant, he told her that he thought she was very godly, and if anything happened to Sherry, L.R. is the kind of woman he would want for his wife. In 2004, L.R. asked to meet with appellant to learn how to memorize Scripture. When she went to appellant's office, he told her that things were hard and he needed comfort. He then placed L.R.'s hands on his genitals, telling her that his wife is not a comfort to him and L.R. is the only one he could trust. When decorating for a wedding shower at the church, appellant pulled L.R. into his office and asked her for oral sex. She refused. However, in September of 2004 appellant convinced L.R. to perform oral sex on him. Eventually the oral sex progressed into sexual intercourse, and the sexual behavior continued regularly through December of 2007. He explained that this was not adultery, telling L.R., "You were given to me by God. You were made just for me." Tr. 635.

{¶11} In 2005, H.G. disclosed her involvement with appellant to a pastor at her new church. This pastor in turn relayed the allegations to the Marion Avenue church, and H.G. was called before a council of pastors. H.G.'s claims were discounted by the church, but the church held a series of meetings about whether to retain appellant as youth pastor. His other victims attended these meetings, either standing in full support of appellant or remaining silent. Many members of the church had become concerned

about appellant's close relationships with young women in the congregation, with one member referring to the group as appellant's "harem." Tr. 229.

{¶12} Although the congregation voted to retain appellant, he resigned from the church and made plans to form his own church with members of his "family." These plans fell apart in January of 2005 when S.S. confessed her relationship with appellant to her husband.

{¶13} Initially, police were not concerned with relationships between appellant and the girls after they turned 18, believing them to be consensual relationships between adults. Appellant was initially indicted in Case No. 08-CR-545 for sexual battery against H.G. and G.R. when they were juveniles. After the nature of the control and mental and spiritual coercion appellant exerted over the girls became apparent to police, the State moved to amend the indictment to include offenses against H.G. and G.R. after they turned 18, and to amend the statutory subsection in counts nine through sixteen, which related to H.G., to allege a violation of R.C. 2907.03(A)(1) rather than a violation of R.C. 2907.03(A)(9) because subsection (A)(9) was not in effect during the time period alleged in these counts.

{¶14} Appellant was later indicted in 09-CR-111 for sexual battery against S.W., L.R., J.F. and S.S. The cases were consolidated for trial.

{¶15} The case proceeded to jury trial in the Richland County Common Pleas Court. Following trial, appellant was convicted of all charges and sentenced to an aggregate term of 40 years in prison, with 5 years mandatory post-release control.

{¶16} Appellant appealed to this court, assigning the following errors:

**{¶17}** "I. DEFENDANT-APPELLANT'S CONSTITUTIONAL AND STATUTORY SPEEDY TRIAL RIGHTS WERE VIOLATED BY THE STATE'S FAILURE TO BRING HIM TO TRIAL WITHIN 270 DAYS OF HIS ARREST.

**{¶18}** "II. THE TRIAL COURT ERRED IN REFUSING TO DISMISS COUNTS OF THE INDICTMENT WHICH WERE FILED AFTER THE EXPIRATION OF THE APPLICABLE STATUTE OF LIMITATIONS.

**{¶19}** "III. DEFENDANT-APPELLANT'S CONSTITUTIONAL AND DUE PROCESS RIGHTS WERE VIOLATED BY THE GENERIC FORM OF THE INDICTMENTS AND BILLS OF PARTICULARS AND BY REPEATED AMENDMENTS TO THE INDICTMENTS AND REFUSAL TO PERMIT GRAND JURY TRANSCRIPT INSPECTION, SUCH THAT HIS CONVICTIONS MUST BE REVERSED.

**{¶20}** "IV. THE TRIAL COURT ERRED IN REFUSING TO DECLARE A MISTRIAL, DISMISS COUNTS INVOLVING G.R., STRIKE HER TESTIMONY OR INSTRUCT THE JURY AS TO THE ASSERTION OF HER FIFTH AMENDMENT RIGHTS.

**{¶21}** "V. THE DEFENDANT WAS DENIED DUE PROCESS BY THE STATE'S FAILURE TO PROVIDE TIMELY DISCOVERY, FAILURE TO PROVIDE EVIDENCE FAVORABLE TO THE ACCUSED AND THE STATE'S MISUSE OF PRETRIAL SUPERVISION AUTHORITY, SUCH THAT THE CHARGES AGAINST HIM SHOULD HAVE BEEN DISMISSED.

**{¶22}** "VI. THE VERDICT FORMS DO NOT SUPPORT DEFENDANT'S CONVICTIONS FOR 42 COUNTS OF SEXUAL BATTERY."

{¶23} This Court affirmed the judgment of conviction and sentence. *State v. Picard*, Richland App. No. 2009 CA 0108, 2010-Ohio-6358. Appellant filed a motion to reopen his appeal pursuant to App. R. 26(B), arguing that appellate counsel was ineffective for failing to raise a sufficiency of the evidence claim as to all eight counts of sexual battery against H.G. On April 14, 2011, this Court granted the motion to reopen. Appellant assigns two errors on the reopened appeal:

{¶24} "THE TRIAL COURT ERRED BY CONVICTING MR. PICARD FOR SIX COUNTS OF SEXUAL BATTERY IN CASE NO. 2008-CR-545H WITHOUT SUFFICIENT EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶25} "II. APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION, FOR FAILING TO RAISE A WINNING ISSUE ON APPEAL."

I, II

{¶26} We address both assignments of error together, as in the second assignment of error, appellant argues counsel was ineffective for failing to raise the sufficiency of the evidence claim he raises in his first assignment of error as to H.G. Appellant argues that the state only presented evidence of sexual conduct, as required to support a conviction for sexual battery, to support two counts. He accordingly argues he should have been acquitted on six counts and only convicted of two counts.

**{¶27}** A properly licensed attorney is presumed competent. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 524 N.E.2d 476. Therefore, in order to prevail on a claim of ineffective assistance of counsel, appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136. In other words, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

**{¶28}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶29}** Appellant was convicted of eight counts of sexual battery where H.G. was the victim. Sexual battery is defined by R.C. 2907.03(A)(1):

**{¶30}** "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

**{¶31}** The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution."

**{¶32}** Sexual conduct is defined by R.C. 2907.01(A)(1):

**{¶33}** "(A) 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex;

and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

**{¶34}** Upon a complete review of H.G.'s testimony, we find evidence sufficient to support convictions on three counts of sexual battery.

**{¶35}** Appellant concedes that the following testimony provides evidence sufficient to support two convictions of sexual battery:

**{¶36}** "Q. 17 years.  Okay.  When's the next incident that you recall that involves some sort of inappropriate touching?

**{¶37}** "A. I don't know if I'll get them all in the right order, but there was an incident in the basement of the house.  His wife and his children were home.

**{¶38}** "Q. And how old were you?

**{¶39}** "A. I would have been 16 still.

**{¶40}** "Q. What happened in the basement?

**{¶41}** "A. I went over to the house to have dinner, and he decided that he was going to work out and I was going to spot him.  We went down and there was fondling and kissing, and there was a point where he grabbed a towel and ejaculated into that towel.

**{¶42}** "Q. Well, how does he reach the point of ejaculation if - - in this whole scenario?

**{¶43}** "A. Just I was giving him oral sex and just touching and - -

**{¶44}** "Q. Okay.  Was he touching you?

**{¶45}** "A. Yes.

**{¶46}** "Q. And where was he touching you?

**{¶47}** "A. My breasts and my vagina.

**{¶48}** "Q. At any point as he's touching you, is he inserting his - - his penis or his fingers?

**{¶49}** "A. No, not this time, no.

**{¶50}** "Q. And how is it while you're down there spotting for him that it turns into a sex act?  Do you have a recollection of that?

**{¶51}** "A. No.

**{¶52}** "Q. Any idea of whether or not he took off his clothing or - -

**{¶53}** "A. He had his pants down, but he didn't take them off.

**{¶54}** "Q. And where were his wife and children?

**{¶55}** "A. Upstairs.  His wife was cooking dinner."  Tr. 171-172.

**{¶56}** "Q. Does there come another time that you see him then again?

**{¶57}** "A. He came to see me one last time.

**{¶58}** "Q. And what happens on that one last time?

**{¶59}** "A. We drove in his car out to an old country road and had another intimate time.

**{¶60}** "Q. And by intimate time, you have to be a little more specific.

**{¶61}** "A. There was kissing and fondling and I gave him oral sex."  Tr. 176.

**{¶62}** We also find that H.G.'s testimony concerning the following incident is sufficient to support a finding of sexual conduct:

**{¶63}** "Q. Then does another incident happen?

**{¶64}** "A. Yes.

{¶65} "Q. What happens - - what's the next incident you remember?

{¶66} "A. The next incident is - - occurs when I was at his house, and I don't remember if the kids were there. I always assume that the kids are there, because that's what I did. I went to baby-sit. But it happened in his - - oh, yes, actually I do remember. His kids were there. They were upstairs napping, because I remember Greg came in. We were in the bedroom, clothes completely off.

{¶67} "Q. And what was going on with clothes completely off?

{¶68} "A. A lot of touching, kissing. That time he did insert his finger inside of me. But it didn't go any further than that because, like I said, Greg got up and came into the room. That ended things.

{¶69} "Q. Was there any oral sex?

{¶70} "A. I don't remember." Tr. 174.

{¶71} Appellant argues as to this incident of digital penetration that the state failed to prove that "Mr. Picard actually penetrated an orifice that is prohibited under R.C. 2907.01(A)." Brief of appellant, p. 6. H.G. specifically testified that appellant penetrated her with his fingers. While she did not use the word vagina at that time, in the testimony at page 172, quoted above, she testified that he touched her vagina. When asked if he inserted his penis or fingers she testified, "not this time." Therefore, when she shortly thereafter testifies that she and appellant were touching and "that time he did insert his finger inside of me," it is clear from the context that she was referring to digital penetration of her vagina.

{¶72} Because the state presented evidence to support convictions on only three counts of sexual battery against H.G. and appellant was convicted of eight counts,

appellate counsel was ineffective in failing to raise this issue on direct appeal. The first and second assignments of error are sustained in part.

**{¶73}** App. R. 26(B)(9) provides:

**{¶74}** "If the court finds that the performance of appellate counsel was deficient and the applicant was prejudiced by that deficiency, the court shall vacate its prior judgment and enter the appropriate judgment. If the court does not so find, the court shall issue an order confirming its prior judgment."

**{¶75}** In accordance with this rule, our December 20, 2010, judgment affirming appellant's judgment of conviction and sentence is vacated as to five of the eight counts of sexual battery against H.G. Our December 20, 2010, judgment is confirmed in all other respects.

{¶76} The judgment of the Richland County Common Pleas Court convicting appellant of five counts of sexual battery against H.G. is reversed and this cause is remanded to that court for resentencing.

By: Edwards, J.

Hoffman, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

[Cite as *State v. Picard*, 2011-Ohio-6781.]

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| JOHN S. PICARD | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2009CA0108 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Richland County Court of Common Pleas is affirmed in part, and reversed in part and remanded to the trial court for further proceedings. Costs assessed to appellee.

_____

_____

_____

JUDGES